UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| WM CAPITAL PARTNERS 85, LLC, | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. <br> ) 23-11658-FDS |
| CASHMAN EQUIPMENT CORP.; <br> CASHMAN SCRAP & SALVAGE, LLC; <br> SERVICIO MARINA SUPERIOR LLC; <br> and JAMES M. CASHMAN, | ) |
| Defendants. | ) |

**MEMORANDUM AND ORDER ON DEFENDANTS' MOTION TO DISMISS AND
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

**SAYLOR, C.J.**

This is an action brought by a secured creditor concerning its rights under certain credit, guarantee, and maritime security agreements, as modified by a Chapter 11 plan of reorganization. Plaintiff WM Capital Partners 85, LLC, as assignee of Banc of America Leasing & Capital, LLC, has brought suit against defendants Cashman Equipment Corp.; Cashman Scrap & Salvage, LLC; Servicio Marina Superior, LLC; and James M. Cashman.[1] WM Capital seeks, among other things, an order directing defendants to transfer title and interest in certain vessels and related charter agreements as well as a declaratory judgment for amounts owed and payable to it.

---

[1] For reasons that are not set forth in the record, defendant Banc of America Leasing & Capital, LLC, uses the spelling "Banc" rather than "Bank."

Defendant has moved to dismiss the complaint in part for failure to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6), and plaintiff has moved for partial summary judgment. For the following reasons, both the motion to dismiss and the motion for partial summary judgment will be denied.

## I. Background

### A. Factual Background

The facts are set forth as alleged in the complaint.

Cashman Equipment Corp.; Cashman Scrap & Salvage, LLC; Servicio Marina Superior, LLC; and James M. Cashman "specialize in the charter and sale of ocean-going and inland barges and tugboats servicing the marine construction, oil and gas, scrap and salvage, and marine remediation industries worldwide." (Compl. ¶ 15). They currently operate 89 vessels and perform services on the Atlantic coast, the Gulf of Mexico, and throughout the world. (*Id.* ¶¶ 16-17).

On June 9, 2017, all four defendants filed Chapter 11 bankruptcy petitions in the Bankruptcy Court for the District of Massachusetts. (*Id.* ¶ 35).[2] The Bankruptcy Court found that as of the petition date, defendants owed $12,210,607.57 to Banc of America Leasing & Capital, LLC. (*Id.* ¶¶ 2, 31-34, 36). That debt was "secured by a valid, enforceable, and perfected, first priority lien on and security interest" in five vessels: four U.S. flag barges (the JMC 3010, 3011, 2600, and 2601) and one Vanuatu flag barge (the MISS NORA). (*Id.* ¶¶ 23, 36-37). The relevant terms of the mortgages are set forth in the body of this memorandum.

On December 14, 2018, the Bankruptcy Court confirmed a plan of reorganization. (*Id.* ¶

---

[2] Each of the four defendants involved in this action filed a Chapter 11 bankruptcy petition on June 9, 2027. (Compl. ¶ 35). On June 12, 2017, the Bankruptcy Court entered an order "directing joint administration of these Chapter 11 cases under the case of Cashman Equipment Corporation, Case No. 17-12205." (*Id.*).

38). On December 31, 2018, WM Capital Partners 85, LLC, purchased the debt of Banc of America Leasing & Capital. (*Id.* ¶ 31).[3] Among the provisions of the plan of reorganization were "specified monthly installment payments to WM Capital Partners for its Allowed Secured Claim." (*Id.* ¶ 40). "Failure to make any monthly installment within three business days of such payment being due (or, no more than once annually, failure to make any such payment within three business days after receiving a notice of default from the Lender)" would constitute a default under the plan. (*Id.* ¶ 41). Default, in turn, would precipitate "the occurrence of the Lender Maturity Date." (*Id.* ¶ 42). On the maturity date, the debtor would be obligated to pay the lender the "unpaid balance (if any) of its Allowed Secured Claim." (*Id.* ¶ 43). If the debtor failed to pay the lender in full on the maturity date, the lender would be permitted to add to the debt the "reasonable costs of collecting such unpaid balance, including attorneys' fees." (*Id.*). In addition, the plan of reorganization provided for the "retention of the liens held by WM Capital Partners on the Vessels under the Loan Documents" and left "undisturbed any guaranty obligations under the Loan Documents." (*Id.* ¶¶ 44-45).

On February 28, 2023, WM Capital sent a "notice of default and reservation of rights" to Cashman Equipment. (*Id.* ¶ 47). On March 3, 2023, WM Capital sent a "payment demand letter" to Cashman Equipment, requesting that it pay "the proceeds, payment or charter hire on account of the Vessels in accordance with the Loan Documents." (*Id.* ¶ 48).

On March 13, 2023, WM Capital "sent a second notice of default and acceleration of debt" to all defendants. (*Id.* ¶ 49).[4] In that notice, WM Capital Partners provided defendants "an

---

[3] The purchase of the debt resulted in "the assignment . . . of the Loan Documents, including the Fleet Mortgage and the MISS NORA Mortgage, to WM Capital Partners." (*Id.* ¶ 31).

[4] WM Capital contends that a "Default occurred under the Plan" no later than March 16, 2023, three business days following defendants' receipt of the March 13 letter. (*Id.* ¶ 53).

3

option to transfer title to the Vessels in exchange for extinguishment of the outstanding indebtedness, pursuant to the terms of the Fleet Mortgage and the MISS NORA Mortgage." (*Id.* ¶ 50; *Id.* at Exhibit E).

Notwithstanding those demands, according to the complaint, WM Capital has "not been paid in full, nor have the Defendants transferred title of the Vessels in accordance with the Fleet Mortgage and the MISS NORA Mortgage, nor have the Defendants assigned all of their rights, title and interest in each of the Charters to WM Capital Partners as provided in the Charter Assignment and Loan documents." (*Id.* ¶ 51). It alleges that "[a]s of July 10, 2023, not less than $12,324,134.93 is due" in addition to "attorneys' fees and other expenses." (*Id.* ¶ 54). Those "amounts due and owing continue to accrue daily." (*Id.*).

WM Capital contends that defendants have conceded default. On April 13, 2023, WM Capital "moved in the Bankruptcy Court to reopen Defendants' bankruptcy case to enforce the Plan," but the court "declined to reopen the cases, citing in part the availability of other forms and its view of the limited role of the Bankruptcy Court to enforce post-confirmation plans." (*Id.* ¶ 55). During those proceedings, defendants "admitted that they have not been making the payments required under the Plan," both in their "filed oppositions and before the [c]ourt." (*Id.* ¶¶ 55-58).

B.   **Procedural Background**

The complaint asserts two claims against all defendants: (1) a claim to "enforce and collect the obligations evidenced by the Loan Documents, and Plan, and to enforce the Fleet Mortgage, the MISS NORA Mortgage, and the Charter Assignment" under 46 U.S.C. § 31325(b) (Count 1), and (2) a claim for breach of contract (Count 2). (*Id.* ¶ 62). In Count 1, plaintiff requests that the court "[e]nter a final judgment *in personam* against Defendants . . . granting [it] title to the Vessels . . . and requiring Defendants to assign all of their

4

rights, title and interest in the Vessels' respective Charters to [it]." (*Id.* at ¶ 1). In Count 2, plaintiff requests that the court "issue a declaratory judgment that a default exists under the Loan Documents and Plan and a judgment in favor of [it] in the amount of $12,504,475 plus accrued interest, fees and expenses." (*Id.* at ¶ 87).

Plaintiff has moved for partial summary judgment "and an order for specific performance of provisions of two preferred ship mortgages and a charter assignment." (ECF No. 3, 1).

Defendants have moved to dismiss in part for failure to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6).

Each motion will be addressed in turn, beginning with defendants' motion to dismiss.

## II.     **Defendants' Motion to Dismiss**

### A.     **Standard of Review**

On a motion to dismiss, the court "must assume the truth of all well-plead[ed] facts and give . . . plaintiff the benefit of all reasonable inferences therefrom." *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)). To survive a motion to dismiss, the complaint must state a claim that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). That is, "[f]actual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id.* at 555 (citations omitted). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556). Dismissal is appropriate if the complaint fails to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008) (quoting *Centro Medico del Turabo, Inc. v. Feliciano de Melecio*, 406 F.3d 1,

6 (1st Cir. 2005)).

On a motion to dismiss, the court may properly take into account four types of documents outside the complaint without converting the motion into one for summary judgment: (1) documents of undisputed authenticity; (2) documents that are official public records; (3) documents that are central to plaintiff's claim; and (4) documents that are sufficiently referred to in the complaint. *Watterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993).

**B.      Analysis**

Defendants have moved to dismiss the complaint "to the extent that it seeks an order compelling the Cashman Parties to deliver title to four U.S. flag barges . . . and a Vanuatu flag barge . . . to WM Capital." (ECF No. 17, 1). They contend, in substance, that the relevant agreements and applicable law do not grant WM Capital the power to require delivery of title, and that transferring title to WM Capital would give it a substantial windfall because the value of the vessels exceed the amount of the indebtedness.[5]

As a general matter, under the Commercial Instruments and Maritime Liens Act, 46 U.S.C. § 31301 *et seq.* (the "Ship Mortgage Act"), the holder of a senior mortgage on a maritime vessel may, upon default, enforce the mortgage by bringing an action against the vessel *in rem* or against the owner *in personam*. *See generally J.P. Morgan Chase Bank, N.A. v. M/Y Brittany Leigh II*, 2011 U.S. Dist. LEXIS 105069, *3-4 (D. R.I. Aug. 23, 2011), adopted by 2011 U.S. Dist. LEXIS 104855 (D. R.I. Sept. 15, 2011); *Goldfish Shipping, S.A. v. HSH Nordbank AG*, 2008 U.S. Dist. Lexis 93135 at *12 (E.D. Pa. Nov. 3, 2008); *see also* Fed. R. Civ. P. Supplemental Rules for Certain Admiralty and Maritime Claims Rule C(1) ("Except as otherwise

---

[5] Because this is a motion to dismiss, there is nothing in the record as to the valuation of the vessels or the equity, if any, defendants have in those vessels.

provided by law a party who may proceed *in rem* may also, or in the alternative, proceed *in personam* against any person who may be liable."). In an action *in rem*, the vessel itself is the defendant. *Freeman v. Alderson*, 119 U.S. 185, 187 (1886) (explaining that "[a]ctions *in rem*, strictly considered, are proceedings against property alone" and that "[t]he property itself is in such actions the defendant"); *Ventura Packers, Inc. v. F/V Jeanine Kathleen*, 424 F.3d 852 (9th Cir. 2005) (noting that jurisdiction *in rem* against a vessel "rests on the legal fiction that the ship itself caused the loss and may be called into court to make good") (internal quotations omitted). In an action *in rem* to enforce a mortgage, the vessel is typically seized and sold at a judicial sale, with the proceeds used to satisfy the claims of creditors and the balance, if any, going to the owner. *See* 46 U.S.C. § 31326.[6]

It is not disputed that the defendants are in default. WM Capital contends that the vessels are "presently servicing charter routes in various foreign jurisdictions where, as a practical matter, the physical arrest of the collateral Vessels . . . is extraordinarily difficult to accomplish." (ECF No. 19, 6). Accordingly, it has elected not to proceed *in rem* against the vessels, but against the four defendants *in personam* to enforce its security interests.

Both mortgages provide a broad variety of different powers and remedies to WM Capital in the event of a default.

Both the Fleet Mortgage and the MISS NORA Mortgage give WM Capital the right to seek specific performance.[7] *See* Fleet Mortgage § 9.6 (providing that WM Capital in the event of default "may . . . commence an appropriate action against Shipowner seeking specific

---

[6] Under 46 U.S.C. § 31326, "[w]hen a vessel is sold by order of a district court in a civil action *in rem* brought to enforce a preferred mortgage lien or a maritime lien, any claim in the vessel existing on the date of sale is terminated, including a possessory common law lien . . . , and the vessel is sold free of all those claims."

[7] These mortgages remain "unimpaired by the bankruptcy Plan." (ECF No. 19, 8).

7

performance of any covenant contained herein . . . ."); MISS NORA Mortgage § 4.02 (providing that WM Capital in the event of default may enforce its "rights by an action at law, suit in equity or other appropriate proceeding . . . for the specific performance of . . . the Secured Obligations . . . .").

Both mortgages grant WM Capital the right to take possession of the vessels and to sell them. (*Id.*). *See* Fleet Mortgage § 9.2.3 (providing that WM Capital may "take and enter into possession" of the vessels and "sell any Vessel, whether in whole or in component parts, at public or private sale."); MISS NORA Mortgage § 4.03 (same).

Both mortgages grant WM Capital the right to direct defendants to surrender the vessels at a location of its choosing. *See* Fleet Mortgage § 9.2.2. ("Shipowner and all other persons then in possession of any Vessel, shall forthwith, upon demand by Mortgagee, surrender possession of such Vessel"); MISS NORA Mortgage § 4.03 ("Owner or any other Person in possession of the Vessel shall forthwith, upon demand of Mortgagee, assemble and surrender possession thereof to Mortgagee").

Finally, both mortgages grant WM Capital the right to seek equitable relief in "aid" of its other powers. *See* Fleet Mortgage § 9.6 (providing that WM Capital "may . . . commence an appropriate action against Shipowner . . . in aid of the execution or enforcement of any power herein granted"); MISS NORA Mortgage § 4.02 (providing that WM Capital may enforce its "rights by . . . a suit in equity or other appropriate proceeding . . . for an injunction against a violation of . . . the Secured Obligations . . . or in aid of the exercise of any power granted by this Mortgage").

Defendants nonetheless contend that those remedies do not include, and do not permit, equitable relief in the form of an order transferring title to the vessels to defendants.

First, defendants contend that the "relevant Mortgage provisions provide that WM Capital, upon default, could only take possession, use, and/or sell the Collateral Vessels." (*Id.* at 17, 12). They contend that "[t]he Mortgages do not require the Cashman Parties to transfer title to the Collateral Vessels to WM Capital and thereby forfeit the substantial equity in the Vessels." (*Id.* at 12-13). To the extent that the provisions do "provide for an action of specific performance," defendants allege that "such specific performance is limited to the terms of the Mortgage itself, which . . . do not require the Cashman Parties to transfer title to the Collateral Vessels to WM Capital." (*Id.* at 13).

The power to "take . . . possession" of the vessels does not necessarily imply the right to take title to the vessels. Parties routinely lease or rent property without holding title to the property. But the right to "sell" a vessel surely does imply the right to take title. Without title to a vessel, it is not possible (or at least highly impracticable) to consummate a valid sale. The mortgages clearly permit title to be transferred in connection with an *in rem* proceeding, as defendants concede.[8] And the mortgages do not distinguish between *in rem* and *in personam* proceedings in terms of available relief. There is thus nothing in the agreements that limits plaintiff to an *in rem* proceeding if it wishes to obtain title to the vessels.

Furthermore, the mortgages contain broad language granting plaintiff to enforce its rights, among other ways, in a "suit in equity" for an injunction "in aid of the execution or enforcement of any power herein granted" (Fleet § Mortgage 9.6) "in aid of the exercise of any

---

[8] Section 9.2.5 of the Fleet Mortgage provides that "[a]ny sale of any Vessel and/or its component parts made pursuant to this Mortgage, whether under the power of sale hereby granted or in any judicial proceeding shall operate to divest Shipowner of all rights, *title* and interests of any nature whatsoever, and shall bar Shipowner and Shipowner's successors and assigns, and all other persons claiming by, through or under them, from any and all further rights claims or interests in or to such Vessel and its components." Fleet Mortgage § 9.2.5 (emphasis added). Section 5.01 of the MISS NORA Mortgage provides that "[a]ny sale of the Vessel made pursuant to this Mortgage . . . shall operate to divest all right, *title* and interest of any nature whatsoever of Owner . . . ." MISS NORA Mortgage § 5.01 (emphasis added).

power granted by this mortgage" (MISS NORA Mortgage § 4.02).  Clearly an injunction directing the transfer of title to plaintiff would "aid" the exercise of the power granted to plaintiff to sell the vessels.[9]

Defendants further contend, however, that an order compelling the defendants to deliver title to the vessels would "[run] afoul of the equitable maxim that 'equity abhors a forfeiture.'" (ECF No. 17, 16).  They contend that granting the requested relief "would result in the effective forfeiture of substantial equity in the Collateral Vessels and a windfall to WM Capital to the disadvantage of the holders of the Additional Plan Lien and the Cashman Parties." (*Id.*).  That hypothetical issue is not properly decided on a motion to dismiss.[10]  Among other things, it is not obvious why equitable relief could not be fashioned in a manner that would protect any remaining interest of defendants (and other creditors, if any) in the vessels once the relevant debts have been satisfied.[11]  Accordingly, the complaint will not be dismissed on that basis.

Finally, defendants contend that Section 5.2(g) of the Bankruptcy Court plan of reorganization and the Massachusetts Uniform Commercial Code, Mass. Gen. Laws ch. 106, § 9-101 *et seq.*, prohibit the requested relief.  Section 5.2(g) of the plan states in part:

> Following the Effective Date, at any time any Lender possesses an outstanding Allowed Secured Claim, the Corporate Debtors and such Lender, in each party's sole discretion, may agree in writing for the Corporate Debtors to surrender to such Lender's Collateral subject to such Lender's senior Lien(s) free and clear of all other claims, liens, encumbrances, and interests (including, for the avoidance of doubt, the Additional Plan Lien); provided that the Corporate Debtors shall not agree to the surrender of any of the Pacwest/MARAD Vessels without the written consent of the GUC Collateral Agent.

---

[9] Presumably, the Court could also issue an injunction ordering that the vessels be surrendered in Massachusetts or other U.S. jurisdiction by a date certain in "aid" of their sale.

[10] Among other things, there is no information in the complaint concerning the valuation of the vessels, and the Court cannot determine whether defendants even have such equity.

[11] Of course, defendants could also protect their equity in the vessels by selling them and using part of the proceeds to discharge the indebtedness.

(Compl., Exhibit B, 118).  "A plan of reorganization is a binding contract between the debtor and the creditors and is subject to the general rules of contract construction and interpretation." *Barraford v. T & N Ltd.*, 778 F.3d 258, 263 (1st Cir. 2015) (quoting *In re New Seabury Co.*, 450 F.3d 24, 33 (1st Cir. 2006)).  Where the "ultimate issue is one of contract interpretation, it may be resolved as a matter of law on a motion to dismiss." *Armstrong v. White Winston Select Asset Funds, LLC*, 2020 WL 10316643 (D. Mass. Mar. 23, 2020); *see also Nadherny v. Roseland Prop. Co., Inc.*, 390 F.3d 44, 48 (1st Cir. 2004) ("Contract interpretation questions, under Massachusetts law, are ordinarily questions of law for a court; contract law, unlike tort law, thus favors judicial resolution of disputes.").

The terms of a contract are unambiguous "where the contract language has a definite and precise meaning, unattended by danger of misconception in the purport of the contract itself, and concerning which there is no reasonable basis for a difference of opinion." *Chesapeake Energy Corp.*, 773 F.3d at 114 (internal alterations and quotation marks omitted) (quoting *Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010)). When the contract language is unambiguous, "the intent of the parties must be found within the four corners of the contract." *Id.* (internal alterations omitted) (quoting *Howard v. Howard*, 292 A.D.2d 345, 345 (App. Div. 2002)).  By contrast, a contract is ambiguous if its terms "could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages, and terminology as generally understood in the particular trade or business." *Id.* (quoting *Law Debenture Tr. Co. of N.Y.*, 595 F.3d at 466).

Here, the terms of Section 5.2(g) are unambiguous.  It provides that if plaintiff possesses an outstanding "Allowed Secured Claim" at any point following the "Effective Date," the

11

corporate debtors "*may* agree in writing" to surrender the collateral. (Compl., Exhibit B, 118) (emphasis added). The complaint does not allege that defendants have provided such consent in writing. To the contrary, plaintiff alleges that defendants "have ignored repeated requests to honor their obligations mandated by the agreements with WM Capital Partners" and "have insisted that WM Capital Partners (as well as other creditors) wait patiently while Defendants hopefully turn the business around, sell vessels, and ultimately pay WM Capital Partners back the money it is owed." (Compl. ¶ 4; *see also Id.* ¶ 51). But Section 5.2(g) simply permits a particular outcome; it does not require it, and does not prohibit any other form of relief or voluntary resolution. Defendants' motion to dismiss will therefore not be granted on the basis that Section 5.2(g) prohibits the requested relief.

For similar reasons, the motion to dismiss will not be granted on the basis that the UCC prohibits the requested relief. Defendants contend that the UCC applies to the Fleet Mortgage and MISS NORA Mortgage "pursuant to their choice of law provisions." (ECF No. 17, 13).[12] As a result, defendants maintain that plaintiff should be prohibited from "requesting an order compelling the Cashman Parties to transfer title to the Collateral Vessels to WM Capital," because plaintiff has failed to "obtain the debtor's post-default consent in good faith" as required by the UCC. (ECF. No. 17, 15).

Under Section 9-620 of the UCC, "a secured party may accept collateral in full or partial satisfaction of the obligation it secures only if the debtor consents to the acceptance under

---

[12] Section 17.2.1 of the Fleet Mortgage provides that "[a]ll questions arising under this mortgage shall be governed by the laws of the United States and, to the extent federal law does not apply, the laws of the Commonwealth of Massachusetts." Fleet Mortgage § 17.2.1. Pursuant to Section 6.04 of the MISS NORA Mortgage, "[t]his Mortgage shall be construed in accordance with, and the rights of the parties hereunder governed by, the Maritime Act of The Republic of Vanuatu, Chapter 313 of Title 46 of the United States Code and the general maritime law of the United States, to the extent applicable, and otherwise by the internal laws of the Commonwealth of Massachusetts." MISS NORA Mortgage § 6.04.

subsection (c)" Mass. Gen. Laws ch. 106, § 9-620(a). Pursuant to subsection (c)(1), "a debtor consents to an acceptance of collateral in partial satisfaction of the obligation it secures only if the debtor agrees to the terms of the acceptance in a record authenticated after default." *Id.* at § 9-620(c)(1). Pursuant to subsection (c)(2), "a debtor consents to an acceptance of collateral in full satisfaction of the obligation it secures only if the debtor agrees to the terms of the acceptance in a record authenticated after default or the secured party: (A) sends to the debtor after default a proposal that is unconditional or subject only to a condition that collateral not in the possession of the secured party be preserved or maintained; (B) in the proposal, proposes to accept collateral in full satisfaction of the obligation it secures; and (C) does not receive a notification of objection authenticated by the debtor within 20 days after the proposal is sent." *Id.* at § 9-620(c)(2).

As noted, both the Fleet Mortgage and the MISS NORA Mortgage contain broad language affording plaintiff a variety of ways to enforce its rights. While acceptance of collateral in full or partial satisfaction of the debtor's obligation under the UCC is available to plaintiff as a remedy, it is not mandatory, and it does not prohibit any other form of relief or voluntary resolution. Indeed, as plaintiff highlights, "a UCC sale may be facilitated following transfer of the title documents to WM Capital Partners." (ECF No. 19, 9).

In any event, and at a bare minimum, plaintiff's claim to equitable relief in the form of the transfer of title is "plausible on its face." *Twombly*, 550 U.S. at 570. The motion to dismiss will therefore be denied.

### III.    Plaintiff's Motion for Partial Summary Judgment

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990)).

Summary judgment shall be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted). In evaluating a summary judgment motion, the court indulges all reasonable inferences in favor of the nonmoving party. *See O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir. 1993). When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotations omitted). The nonmoving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id.* at 256-57.

Plaintiff has moved for partial summary judgment "seeking an order of specific performance of provisions of two preferred ship mortgages and a charter assignment." (ECF No. 4, 4). Here, it is undisputed that each of the defendants filed Chapter 11 bankruptcy petitions in the Bankruptcy Court for the District of Massachusetts on June 9, 2017. (Plaintiff's SUF ¶ 23). It is also undisputed that the Bankruptcy Court confirmed a plan of reorganization through which defendants were obligated to make "specified monthly installment payments to WM Capital Partners for its Allowed Secured Claim." (*Id.* ¶ 28). Finally, it is undisputed that "[t]he amounts due and owing under the Plan and the Loan Documents have not been paid in full" and "[a] Default occurred under the Plan no later than March 16, 2023." (*Id.* ¶¶ 37-38).[13]

---

[13] Defendants note in their motion to dismiss that they "assume *arguendo* solely for the purposes of this Motion that a default has occurred." (ECF No. 17, 1). At the same time, however, they have produced no affirmative evidence indicating that a default did not occur. Plaintiff, on the other hand, has provided specific

Based on those undisputed facts as well as the terms of the mortgage agreements, the liability of defendants for the debt has been established. The Court will not, however, grant summary judgment as to the precise form of relief to be granted. Among other things, the Court will be required to consider how to order relief in a manner that protects any remaining interest of defendants or other creditors in the vessels once the relevant debts have been satisfied. Whether such interest even exists is not part of the present record.

## IV.     Conclusion

For the foregoing reasons, defendants' motion to dismiss is DENIED, and plaintiff's motion for partial summary judgment is GRANTED as to liability only, and otherwise DENIED without prejudice.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV
Chief Judge, United States District Court

Dated:  March 12, 2024

---

evidence that defendants "admitted that they have not been making the payments required under the Plan" both in their "filed oppositions and before the [Bankruptcy] Court." (*Compl.* ¶¶ 55-58).